## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DIANE OLIVER,                )
                                 )
        Plaintiff,        )
                                 )
     vs.               )      Case No. 4:05CV821MLM
                                 )
JO ANNE B. BARNHART,      )
Commissioner of Social Security,     )
                                 )
        Defendant.     )

## <u>MEMORANDUM OPINION</u>

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying Diane Oliver ("Plaintiff") a waiver of recovery of overpayment of Social Security benefits under Title II of the Social Security Act. Plaintiff has filed a brief in support of the Complaint. Doc. 10. Defendant has filed a brief in support of the Answer. Doc. 11. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 4.

## I.
## PROCEDURAL HISTORY

In March 1973, Plaintiff was found to be disabled and entitled to benefits based on epilepsy. (Tr. 12). In August 2000 Plaintiff was notified that she was overpaid $16,883.70 in disability insurance benefits for the period between March 1998 and December 1999 because she performed substantial gainful activity in the months of a re-entitlement period. (Tr. 13). Plaintiff filed a request for waiver which was denied. (Tr. 13). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On March 15, 2004, following a hearing, ALJ Francis J. Eyerman found that Plaintiff was overpaid benefits and was not without fault in receiving and accepting the overpayment. (Tr. 12-

17). On March 16, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's determination. (Tr. 4-8). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## BACKGROUND

**History of Plaintiff's Overpayment:**

The Social Security Administration informed Plaintiff by letter, dated November 4, 1999, as follows:

> We are increasing your benefit amount to give you credit for your earnings in 1998 which were not included when we figured your benefit before.
>
> WHAT WE WILL PAY
>
> You will receive a payment shortly after December 3, 1999 for $2,345.00. This payment [will] include[] both your new regular monthly benefit and benefits due from January 1999, the month of the increase, through November 1999.
>
> After that, you will receive your regular monthly payment of $795.00.

(Tr. 145).

The Social Security Administration sent Plaintiff a letter dated August 26, 2000, stating as follows:

> We are writing to give you new information about the disability benefits which you receive on this Social Security record. In the rest of this letter, we will tell you:
>
> > How we paid you $16,883.70 too much in benefits: and
> >
> > What to do if you think we are wrong about the overpayment.
>
> **Your benefits**
>
> You are overpaid because you were consder[ed] to be working at su[b]stantial gainful work. You were previously sent a notice in regards to this matter. ...
>
> **How You Can Pay Us Back**

2

You should refund the overpayment within 30 days. ...

If we do not receive your refund within 30 days, we plan to recover the overpayment by withholding your full benefit each month beginning with the payment you would normally receive about November 3, 2000. We will continue to withhold your full benefits until the overpayment has been fully recovered.

We will pay you a monthly check of $816.00 until we start to collect the overpayment.

(Tr. 25).

On September 12, 2000, Plaintiff filed a Request for Waiver of Overpayment Recovery or Change in Repayment Rate in which she claimed that the overpayment was not her fault and that she could not afford to pay the money back and/or that it was unfair for some other reason. Plaintiff stated on this form that she did not realize that she was being overpaid; that she asked what to do before she started working and followed directions which she was given; that she went to the Social Security office and asked if she could work; and that the lady at the Social Security office told her that she could work as long as she made $600 a week. (Tr. 29-30). Plaintiff reported that her income included $816 a month from Social Security and $70 in food stamps; that her monthly expenses totaled $1,193; and that she went to work part-time because her expenses exceeded her income. (Tr. 33-35). Plaintiff also reported that she was not told at the Social Security office that she had to report income if it was below $600 and that she was not given any printed information. (Tr. 36). Plaintiff also submitted bills, including $146.00 from the electric company, $75.07 from the gas company, $30.74 from the water company, and $103.49 from the telephone company. (Tr. at 37-40).

By letter dated October 3, 2000, the Social Security Administration informed Plaintiff that in October 2000 she would receive no benefits as $816.50 would be withheld; that in May 2002 she would receive $346.30 with $515.20 being withheld; that as of the May 2002 payment she would not

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

have a balance due; that in June 2002 she would receive $861.50; and that after May 2002 she would receive full regular monthly payments. (Tr. 41).

By letter dated October 25, 2000, the Social Security Administration informed Plaintiff that it received her request that it not collect the overpayment and that she would receive benefits of $816 a month until Social Security responded to her request. (Tr. 43). By letter dated December 8, 2000, Plaintiff was informed of a higher benefit rate of $841 a month. (Tr. 45).

On November 30, 2000, Plaintiff's waiver request was informally denied and she was notified that a personal conference would be scheduled. (Tr. 106).

By letter dated April 4, 2001, the Social Security Administration informed Plaintiff of a new repayment schedule and stated that she would not be paid anything from April 2001 through October 2002 and would commence receiving benefits in October 2002. (Tr. 51).

By letter dated June 18, 2001, Plaintiff requested a repayment rate of $50. This letter further stated that Plaintiff was working part-time and taking home $600.16 a month. (Tr. 53).

A memo of the Social Security Office of Central Operations dated July 10, 2001, reflects that Social Security made multiple searches and could not find Plaintiff's folder. (Tr. at 83).[1]

By letter dated July 24, 2001, the Social Security Administration informed Plaintiff that it used $2,399 of her benefits to recover all of her overpayment; that it raised her monthly benefit beginning January 2000 to give her credit for her 1999 earnings; that it raised her monthly benefit beginning January 2001 to give her credit for her 2000 earnings; that her next check would be for $824.30, which is the money she was due through June 2002; and that after that she would receive $1,003 each month. (Tr. 65).

----

[1]     According to Plaintiff this file contained her application for benefits, medical records, and procedural documents. Doc. 10 at 3.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

On August 9, 2001, Plaintiff appealed the decision to withhold 100% of her benefits and filed a Request for Reconsideration. (Tr. 68-70). In a letter to the Social Security Administration Plaintiff's lawyer stated that Plaintiff was unable to pay recent mortgage bills; that she was in danger of losing her house because she had been unable to pay her monthly mortgage bills; that she was in danger of losing her Medicare benefits because she was unable to pay the premiums without her Social Security benefits; and that she was sixty-three years old and could not afford the stress and expense of moving. (Tr. 68).

By letter dated August 28, 2001, Plaintiff informed the Social Security Administration that she agreed to have $300 withheld from her benefit check each month to go toward the alleged overpayment. (Tr. 74).

Plaintiff's Medicare coverage was stopped September 3, 2001, because she had not paid the premiums. (Tr. at 75). By letter dated September 5, 2001, Plaintiff was told that her request that a smaller amount be withheld was received and that she would receive benefits until Social Security responded to her request. She was further told that she would receive $753 in September 2001; that she would receive $1,053 in October 2001; and that she had a balance due of $9,705.70. (Tr. 78).

The Social Security Administration sent a letter to Plaintiff dated October 2, 2001. This letter stated that Plaintiff would receive $503 in October 2001 with $300 being withheld; that in November 2001 she would receive $753 with $300 being withheld; that after November 2001 she would receive $753 each month; and that in August 2004 she would begin receiving her full monthly amount. (Tr. 79, 150).

Records reflect that as of December 2001, January 2002, May 2002, and November 2003 Plaintiff's file was still missing. (Tr. 84, 86, 88, 165). Records indicate that Plaintiff's folder was destroyed by the Federal Records Center sometime after 1996. (Tr. 92).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

On June 10, 2002, Plaintiff completed another Request for Waiver, stating that she was not aware she was being overpaid while she was receiving benefits. (Tr. 130-37).

Earnings records reflect that Plaintiff earned $184.16 in 1979; that she had no earnings in 1980-1985; that she earned $162.48 in 1986; that she had no earnings from 1987 through 1996; and that she earned $6,763.52 in 1997. (Tr. at 80-81). Records further reflect that in 1998 Plaintiff earned $11,214.19; that in 1999 she earned $10,020.17; and that in 2000 her earnings totaled $5,442.32. (Tr. 81). In the first quarter of 2001 Plaintiff earned about $2,098; in the second quarter of that year she earned $2,443; and in the third quarter of 2001 she earned $3,059. (Tr. 112-13).

A statement from the gas company indicated that Plaintiff owed $365.50 on her gas bill; that she was in arrears of $182.50; and that the total amount was due on August 13, 2002. Another fill from the gas company states that Plaintiff's current charges were $125.17 and that payment was due on January 14, 2002. (Tr. 138, 140). A bill from the water company states that Plaintiff owed $15.37 on her water bill and that this amount was due July 16, 2002. (Tr. 138). In August 2002 Plaintiff made a $367.03 payment to a lending company. (Tr. 139).

Plaintiff filed a chapter 13 bankruptcy case in 1997 which concluded on or about August 3, 2002. (Tr. 141-42).

**Plaintiff's Medical History:**

Records of A. El-Tomi, M.D., of the Hopewell Center, reflect that on December 12, 1998, Plaintiff had recurrent major depression, seizure disorder, obesity, and was assigned a Global Assessment Functioning ("GAF") of 60.[2] Dr. El-Tomi further reported on this date that Plaintiff

---

[2]    Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

currently had no complaints; that her sleep and appetite were fair; that she had no vegetative depressive symptoms and no clinical adverse effect from medication; and that she had not recently had any seizures. (Tr. 161).

Dr. El-Tomi reported on May 12, 1999, that Plaintiff had "no depression." (Tr. 162). On July 26, 1999, Dr. El-Tomi reported that Plaintiff was "in remission under medication"; that she had received no seizure medicine "as was decided by her neurologist," Dr. Brenner; and that since her medication was stopped she had not had any seizures. On this date Dr. El-Tomi reported that Plaintiff' GAF was 60-65 and that she had periods of non-compliance. (Tr. 163).

Dr. El-Tomi reported on November 18, 1999, that, "[t]he patient has been released from Dr. Brenner the Neurologist who believes she has no more seizures and she is currently on no medications for seizure disorder. The patient's depression has lifted. Anxiety is fairly controlled with medication." Dr. El-Tomi recommended that Plaintiff take Elavil and Tranxene. (Tr. 164).

An Assessment from the Hopewell Center, dated February 8, 2002, states that Plaintiff had a GAF of 45. (Tr. 154). An Medication Profile from the Hopewell center , dated June 7, 2002, states that Plaintiff had depression, asthma, seizure disorder, headaches and a GAF of 50 and that she had a history of partial compliance with medication. Records of June 14, 2002, state, "I & J Limited - poor." [3] Notes of this date further state that Plaintiff was casually dressed; that she had "fair grooming" and "fair eye contact; that she was pleasant; that her speech was monotone; and that she said that she reported that she could not sleep. (Tr. 158-59).

---

communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," and scores of 61 to 70 represent "mild," Scores of 90 or higher represent absent or minimal symptoms or impairment. Id. at 32.

[3]     Plaintiff suggests that this means that Plaintiff had limited to poor insight and judgment. Doc. 10 at 6.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**Testimony Before the Administrative Law Judge:**

Plaintiff testified before the ALJ that she began receiving benefits in 1972 because she was in a mental institution; that at the time of the hearing she was under the care of Dr. Crogranker; that he was treating her for depression; and that she has been under his care since 1972. (Tr. 178, 190-91). Plaintiff said that she has lived at the same address since 1987 and that at the time of the hearing her twenty-seven year old son lived with her. (Tr. 191-92). Plaintiff further testified that in 1997 she began working at the airport in the wheelchair department. (Tr. 180-81).

Plaintiff also testified that she received Social Security benefits consistently from 1972 until 1999; that the Social Security Administration never went over her case with her prior to that time to see if she should continue to receive benefits; and that it did not send her letters asking about her ongoing disability. (Tr. 177). Plaintiff further testified that she went to a Social Security office in 1997 prior to going back to work and was told that she could work as long as she did not earn "too much money"; that she was not told an amount that she could earn; that she was not given any literature; and that she did not receive yearly literature about what work she could perform.[4] (Tr. 178-79). Plaintiff also testified that she was aware that if she had a change in either her financial or health condition that she was suppose to notify Social Security. When the ALJ stated during the hearing that every year the Social Security Administration sends notices to recipients stating that they have

---

[4]     It is not clear from the record if Plaintiff went to the Social Security office on one or two occasions. In any event it is clear that the Plaintiff testified that she went to the office after she returned to work and was told that she could work if she did not make "too much money" and that she was never given a dollar amount of how much she could earn. (Tr. 178-79).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

to notify Social Security of changes in their health and/or financial condition, Plaintiff responded, "[y]es, sir, I did." (Tr. 190).

Plaintiff stated that she never told Social Security something incorrect about her work; that in 1997 she asked a person at Social Security if she was suppose to bring every check stub to Social Security; that she was told to bring her stubs in only if there was a change and that her earnings are "supposed to be reported"; and that at the time she was told this she was not "working more hours." (Tr. at 182-84). Plaintiff testified that she never received a check from Social Security which she did not think she should receive and that she was surprised when she found out she was being charged with an overpayment. (Tr. 184).

Plaintiff further testified that when she returned to work at the airport, possibly in April 1997, she earned $5.15 per hour, eight hours per week; that when she returned to work she worked eight hours a week or eighteen hours a week; that after three months she worked thirty-two hours a week, at which time she worked four days a week; that the number of days and hours she worked each week changed periodically; that she would work four days a week for about six or eight months; that she worked five days for one month; that at the time of the hearing she thought that she would probably be laid off soon because of the decrease in the number of flights; and that at the time of the hearing her gross pay was $602.80, on an average, and she was working twenty-five hours a week. (Tr. 179-180, 195-98).

Plaintiff testified that, at the time of the hearing, with the money she was earning and including the Social Security benefits which she was receiving, she was unable to pay all of her bills.(Tr. 186). She further testified that she had just finished bankruptcy proceedings; that the bankruptcy was filed in September 1997; that she bought a car in that year; that after she bought the car she "got in trouble

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

with the payments"; that the car was taken away; and that at the time of the hearing she owned the same car which was paid off and that she was again behind in her sewer bill. (Tr. 186-89). Plaintiff said that at the time of the hearing she had $164.12 in her checking account and that her monthly expenses include $367.03 for a house payment and payments for light, gas, water, sewer, telephone, and insurance. (Tr. 193).

### III.
### LEGAL STANDARDS

The ALJ's decision is conclusive upon this court if it is supported by "substantial evidence." Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). It is not the job of the court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2005) (internal citations omitted). See also Eichelberger Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

This court also reviews decisions of the Commissioner to determine if there is an error of law. Newton v. Chatter, 92 F.3d 688, 692 (8th Cir. 1996). "To the extent decisions [of the Commissioner] do not comport with [the Eighth Circuit's] holdings, they are in error, and will be reversed." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997).

The absence of objective medical evidence is just one factor to be considered in evaluating a plaintiff's credibility. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must also

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

consider a plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989).

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1996); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Secretary of Health and Human Services, 849 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Secretary of Health and Human Services, 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Secretary of Health and Human Services, 850 F.2d 425, 426 (8th Cir. 1988). Although credibility determinations are in the first instance for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Milbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

In regard to the Commissioner's interpretation of the Social Security Act, the Eighth Circuit has held:

> We note at the outset that an agency's interpretation of the statute that it is charged with administering is entitled to considerable deference. Department of Social Services v. Bowen, 804 F.2d 1035, 1038 (8th Cir.1986) (citing Young v. Community Nutrition Institute, --- U.S. ----, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986)). In Young the Supreme Court stated: 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.' Young, 106 S.Ct. at 2364 (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984)). The Supreme Court has also stated, however, that "'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history.'" Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979)

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(quoting International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979)).

Groseclose v. Bowen, 809 F.2d 502, 505 (8th Cir.1987).

42 U.S.C. § 404(a)-(b), sets forth, in relevant part, Social Security procedures in the event of

an overpayment of benefits:

(a) Procedure for adjustment or recovery

(1) Whenever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made to any person under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Commissioner of Social Security, as follows:

(A) With respect to payment to a person of more than the correct amount, the Commissioner of Social Security shall decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such overpaid person or his estate to refund the amount in excess of the correct amount, or shall decrease any payment under this subchapter payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis of the payments to such overpaid person, or shall obtain recovery by means of reduction in tax refunds based on notice to the Secretary of the Treasury as permitted under section 3720A of Title 31, or shall apply any combination of the foregoing. ...

(b) No recovery from persons without fault

In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience. In making for purposes of this subsection any determination of whether any individual is without fault, the Commissioner of Social Security shall specifically take into account any physical, mental, educational, or linguistic limitation such individual may have (including any lack of facility with the English language).

Additionally, 20 C.F.R. § 404.506 sets forth when a waiver may be applied and states in

relevant part:

(a) Section 204(b) of the Act provides that there shall be no adjustment or recovery in any case where an overpayment under title II has been made to an individual who is

without fault if adjustment or recovery would either defeat the purpose of title II of the Act, or be against equity and good conscience.

20 C.F.R. § 404.510(a)-(n) further defines the circumstances under which a Social Security recipient is without fault in regard to overpayment and states, in relevant part, as follows:

In determining whether an individual is "without fault" with respect to a deduction overpayment, the Social Security Administration will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) the individual has. Except as provided in § 404.511 or elsewhere in this subpart F, situations in which an individual will be considered to be "without fault" with respect to a deduction overpayment include, but are not limited to, those that are described in this section. An individual will be considered "without fault" in accepting a payment which is incorrect because he/she failed to report an event specified in sections 203 (b) and (c) of the Act, or an event specified in section 203(d) of the Act as in effect for monthly benefits for months after December 1960, or because a deduction is required under section 203 (b), (c), (d), or section 222(b) of the Act, or payments were not withheld as required by section 202(t) or section 228 of the Act, if it is shown that such failure to report or acceptance of the overpayment was due to one of the following circumstances:
...

(b) Reliance upon erroneous information from an official source within the Social Security Administration (or other governmental agency which the individual had reasonable cause to believe was connected with the administration of benefits under title II of the Act) with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto. For example, this circumstance could occur where the individual is misinformed by such source as to the interpretation of a provision in the Act or regulations relating to deductions ...

(e) Reasonable belief that in determining, for deduction purposes, his earnings from employment and/or net earnings from self-employment in the taxable year in which he became entitled to benefits, earnings in such year prior to such entitlement would be excluded. However, this provision does not apply if his earnings in the taxable year, beginning with the first month of entitlement, exceeded the earnings limitation amount for such year.

(f) Unawareness that his earnings were in excess of the earnings limitation applicable to the imposition of deductions and the charging of excess earnings or that he should have reported such excess where these earnings were greater than anticipated because of:
...

(2) Work at a higher pay rate than realized; ...

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(g) The continued issuance of benefit checks to him after he sent notice to the Administration of the event which caused or should have caused the deductions provided that such continued issuance of checks led him to believe in good faith that he was entitled to checks subsequently received.

....

(n) Failure to understand the deduction provisions of the Act or the occurrence of unusual or unavoidable circumstances the nature of which clearly shows that the individual was unaware of a violation of such deduction provisions.

20 C.F.R.§ 404.511 sets forth the circumstances under which a claimant is "at fault" in a

deduction overpayment and states in relevant part:

(a) Degree of care. An individual will not be without fault if the Administration has evidence in its possession which shows either a lack of good faith or failure to exercise a high degree of care in determining whether circumstances which may cause deductions from his benefits should be brought to the attention of the Administration by an immediate report or by return of a benefit check. The high degree of care expected of an individual may vary with the complexity of the circumstances giving rise to the overpayment and the capacity of the particular payee to realize that he is being overpaid.

Accordingly, variances in the personal circumstances and situations of individual payees are to be considered in determining whether the necessary degree of care has been exercised by an individual to warrant a finding that he was without fault in accepting a deduction overpayment.

(b) Subsequent deduction overpayments. The Social Security Administration generally will not find an individual to be without fault where, after having been exonerated for a "deduction overpayment" and after having been advised of the correct interpretation of the deduction provision, the individual incurs another "deduction overpayment" under the same circumstances as the first overpayment. However, in determining whether the individual is without fault, the Social Security Administration will consider all of the pertinent circumstances surrounding the prior and subsequent "deduction overpayments," including any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) which the individual may have.

Additionally, 20 C.F.R. § 416.550 clarifies when it is appropriate to waive recovery of an

overpayment and states, in relevant part, that:

15

Waiver of adjustment or recovery of an overpayment of SSI benefits may be granted when ... :

(a) The overpaid individual was without fault in connection with an overpayment, and

(b) Adjustment or recovery of such overpayment would either:

(1) Defeat the purpose of title XVI, or
(2) Be against equity and good conscience, or
(3) Impede efficient or effective administration of title XVI due to the small amount involved.

In Gladden v. Callahan, 139 F.3d 1219, 1222 (8th Cir. 1998), upon considering § 416.550, the Eighth Circuit emphasized that the recovery of overpayment should be waived, according to the Regulations, where the Social Security recipient "is without fault, and recovery would be against equity and good conscience." The court further explained the circumstances under which a recipient might be found at fault and stated that the recipient:

> might be determined to be at fault for accepting overpayment ... if the evidence shows he should have recognized that his changed circumstances warranted notice to Social Security, or at least an inquiry about any effect of that change on his eligibility. 20 C.F.R. § 404.507(b) ("[F]ault on the part of the overpaid individual ... depends upon whether the facts show that the incorrect payment to the individual ... resulted from [f]ailure to furnish information which he knew or should have known to be material....").

Id. at 1223.

The Eighth Circuit explained in Coulston v. Apfel, 224 F.3d 897, 900-901 (8th Cir. 2000), that a Social Security claimant's meeting his burden to establish he is without fault does not end the inquiry. It must also be determined that repayment would defeat the purpose of providing Social Security to the claimant or would be against equity and good conscience. Upon considering the meaning of "equity and good conscience," the court in Groseclose, 809 F.2d at 505-506, held that:

> The Social Security Act is silent as to the meaning of the phrase against equity and good conscience. Unless otherwise defined, statutory words "will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444

U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The term equity "denotes the spirit and habit of fairness and justness." Gilles v. Department of Human Resources Development, 11 Cal.3d 313, 113 Cal.Rptr. 374, 521 P.2d 110, 116 n. 10 (Cal.1974) (quoting Black's Law Dictionary). The term conscience means "the sense of right or wrong together with a feeling of obligation to do or be that which is recognized as good." Webster's Third New International Dictionary 482 (1981). The court in Gilles recognized that "against equity and good conscience" is "language of unusual generality." Gilles, 521 P.2d at 116, 113 Cal.Rptr. at 380. The court also recognized that such broad language "necessarily anticipate[s] that the trier of fact, instead of attempting to channelize his decision with rigid and specific rules, will draw upon precepts of justice and morality as the basis for his ruling." Id. ...

We find it difficult to imagine a more unfair or unjust situation than requiring a person who is without fault to repay overpaid benefits when that person had no knowledge of the overpayments. See United States v. Blackwell, 238 F.Supp. 342, 344-45 (D.S.C.1965) (although having found a change in position for the worse, the court emphasized the lack of knowledge in holding that recovery would be against equity and good conscience). Moreover, recoupment in this case would be inconsistent with the policy expressed in the legislative history--that recoupment should be equitable.

## IV.
## DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and that the ALJ "relied very little on the evidence." She further argues that:

There is no evidence that Plaintiff signed an application for benefits in 1973, of the contents of which she was fully informed: Plaintiff might have been incapacitated by epilepsy or mental illness and had a guardian sign her application or she might have been heavily medicated and signed her application without realizing what it was. In fact, the contents of the an application in 1973 might have varied from the ALJ's recollections or assumptions.

There was no evidence that Plaintiff received yearly (or twice yearly) letters from Social Security reminding her of her reporting duties: in fact, evidence shows no such letters were sent during the time for which records exist.

Doc. 10 at 12.

Plaintiff also argues that the ALJ erred in evaluating her mental state; that the ALJ incorrectly found that Plaintiff should have inherently questioned whether she could get benefits for disability

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

while working; that the ALJ incorrectly interpreted the Act in a manner which suggests that overpayments caused by work activity over the substantial gainful activity level preclude a finding that a waiver should be granted; that the ALJ failed to address critical evidence including letters received by Plaintiff in 1998 and 1999 notifying her that she was due more benefits; and that the ALJ's conclusions are not consistent with Plaintiff's testimony. Plaintiff contends that the ALJ's decision should be reversed outright and she should be granted a waiver without remand. Doc. 10 at 13-14.

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not without fault and that, therefore, she should not be granted a waiver. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

The ALJ first considered that Plaintiff was found disabled in December 1972 due to epilepsy and that her benefits never terminated although they should have been suspended March 1998 through December 1999 while she was engaged in substantial gainful activity. The ALJ further noted that Plaintiff's benefits were converted to old-age insurance benefits in 2003. The ALJ considered the arguments of Plaintiff's counsel that Plaintiff did not understand the effect of her wages on entitlement to payments; that she did not receive literature in the mail after March 1973 explaining that she must report her return to work; that Plaintiff did not mislead the Social Security Administration; that Plaintiff was confused and had psychiatric impairments limiting her functioning while overpayment was occurring; and that there was no record to verify that the Social Security Administration notified Plaintiff that a return to work while receiving benefits would affect her entitlement. Tr. at 13.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

The ALJ considered that even though the Social Security Administration may have been at fault for making an overpayment, an overpaid individual is not relieved from liability for repayment if such individual was not without fault. This reasoning is consistent with 42 U.S.C. § 404(a)(1)(A) as set forth above. Upon considering whether Plaintiff was without fault the ALJ found that Plaintiff's ages of 34 at the time of disability onset and 60 at the time of the overpayment has no affect on her ability to understand her duties to report her return to work and to question whether she should still be receiving payments. The ALJ further found not credible Plaintiff's statements that she did not know her wages could affect her entitlement and that she did not know wages mattered when she was receiving disability insurance benefits. Tr. 13. Upon reaching this conclusion the ALJ considered that "every disability insurance benefit application form, including the one the claimant had to have signed in March 1973, contains notice of the claimant's reporting obligations to the Social Security Administration." He also noted that the "very concept of benefits paid for a disability had to have made the claimant question her receipt of disability benefits, but if the claimant were to be believed when she claims she didn't know her wages could affect her entitlement to receive benefit payments, then she would also have to allege she never heard of the work incentive provisions either." Tr. 14. The ALJ properly considered these inconsistencies in Plaintiff's testimony and the record. See Masterson, 363 F.3d at 738. The ALJ further found that Plaintiff "had to have signed" in 1973 an application containing notices about what to report, including going to work. He added that Plaintiff "had to have wondered how she could still be entitled to payment of a disability benefit." Tr. 14.

Upon discrediting Plaintiff the ALJ noted that Plaintiff's job pushing people in wheelchairs through the airport was a responsible job, which she performed while getting her overpayment. The ALJ found that performance of substantial gainful activity over the relevant time period was evidence

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that Plaintiff could understand, remember, and carry out her duties to the Social Security Administration. Tr. at 15. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148-49 (8th Cir. 2001). A claimant's work record is a proper consideration for determining whether the plaintiff is credible. Polaski, 739 F.2d at 1322

The ALJ concluded that Plaintiff's medical records did not show that she lacked the capability to understand, remember, and comply with her duties to report her wages and question whether she was entitled to receive benefits. (Tr. 15). Based on the above described factors the ALJ concluded that Plaintiff's failure to comply with her duties was deliberate and that this failure was not caused by an impairment or any other factor which is properly considered. To the extent that it can be argued that Plaintiff was not without fault because of her physical or mental condition during the relevant period, as stated above, Plaintiff's medical records reflect that in December 1998, Plaintiff was not having seizures and that she had no depressive symptoms; records of July 1999 show her depression was in remission, she was not taking seizure medication, and she was not having seizures; and records of November 1999 show that her depression and lifted and her anxiety was well controlled with medication. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling).

The ALJ further considered that Dr. El-Tomi reported that Plaintiff had a GAF of 60 in December 1998 and that a GAF of 51 to 60 means moderate symptoms. He also considered that in July 1999 Dr. El-Tomi reported Plaintiff had a GAF of 60-65 and that scores of 61 to 70 mean that the individual has mild symptoms but generally functioning pretty well. (Tr. 15). See n.2, above. The court notes that the medical records considered by the ALJ addressed Plaintiff's physical and mental

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

condition during the period of overpayment and that the dates when it was reported that Plaintiff had a GAF of 45 and 50 were not during the period of overpayment. As such, the ALJ properly considered the objective medical evidence and observations of Plaintiff's doctors upon evaluating Plaintiff's credibility in regard to her claim that she was without fault. Polaski, 739 F.2d at 1322.

Based on the above described factors the ALJ concluded that Plaintiff was not without fault in causing the overpayment because she "failed to furnish information which she knew or should have known was material and she accepted disability payments which she knew or could have been expected to know were incorrect." (Tr. 15).

Even assuming, arguendo, as argued by Plaintiff, that the ALJ may have been wrong in his assumption that Plaintiff signed her original applications for benefits, the ALJ did not completely rely on this assumption. In any case, Plaintiff has not shown that the outcome of the ALJ's decision would have been different had he not considered Plaintiff's alleged knowledge in 1973 that she was required to report earnings. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that an "arguable deficiency in opinion-writing technique" does not require a court to set aside an administrative finding when that deficiency had no bearing on the outcome); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Moreover, it was Plaintiff's burden to show that she was without fault. Coulston, 224 F.3d at 900-901. As set forth above, the ALJ's consideration of Plaintiff's personal circumstances including her age, health, and work history, upon determining that she did not exercise the necessary degree of care requisite to a finding that she was without fault is consistent with the Regulations. 20 C.F.R. § 404.510(a)-(n). Relevant to a determination of whether Plaintiff was at fault, Plaintiff admitted that she was told to report earnings both in correspondence from Social Security and from the Social Security office. See 20 C.F.R.§ 404.510(b). The court notes that Plaintiff admitted that she was told in 1997 that she

could not earn "too much." Significantly, her earnings in 1998 and 1999 were considerably more than the $6,763.52 she earned in 1997. Additionally, as set forth above, during the years Plaintiff's earning exceeded the amount permitted and during which period the ALJ concluded she should have reported her earnings Plaintiff's GAF was within the moderate and mild ranges.

To the extent that the ALJ did not address every argument made by Plaintiff in support of her claim that she was without fault, this failure does not suggest that these aspects of Plaintiff's claim were not considered. See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").

The court finds for the reasons fully set forth above that the ALJ's decision is consistent with the Regulations and applicable case law. See Newton, 92 F.3d at 692. The court further finds that substantial evidence on the record supports the ALJ's conclusion that Plaintiff failed to establish that she was without fault and that, therefore, she was required to return the entire overpayment. See Onstead, 962 F.2d at 804.

Because the ALJ concluded that Plaintiff was not without fault he was not required to proceed with an analysis to determine whether recovery of overpayment would defeat the purpose of the Act, be against equity and good conscience, or impede the administration of the Act. 20 C.F.R. § 416.550. As the ALJ found that Plaintiff was not without fault he correctly found, consistent with 20 C.F.R. § 404.502(a)(1), that recovery of Plaintiff's overpayment cannot be waived.

## V.
## CONCLUSION

This court finds that the decision of the ALJ is supported by substantial evidence on the record as a whole, and that the Commissioner's decision, therefore, should be affirmed.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Brief in Support of Complaint is **DENIED**; [10]

**IT IS FURTHER ORDERED** that the relief sought by Defendant Jo Anne B. Barnhart in her Brief in Support of Answer is **GRANTED**; [11]

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED** in its entirety, with prejudice; [1]

**IT IS FINALLY ORDERED** that a separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum and Order.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of November, 2005.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com